UNITED STATES of America,

v.

Sidney JONES, et al, Defendants.

No. SS85 Cr. 1075–CSH.

United States District Court,
S.D. New York.

June 3, 1986.

Rudolph L. Giuliani, U.S. Atty. for S.D. N.Y., New York City, for U.S.; Baruch Weiss, Asst. U.S. Atty., of counsel.

Barry Krinsky, Brooklyn, N.Y., for defendant Jones.

Douglas F. Eaton, New York City, for defendant Blackmon.

John Doar Law Offices, New York City, for defendant Ogletree; Michael S. Devorkin, of counsel.

John McQuigan, Atlanta, Ga., for defendant Roland.

Robert L. Herbst, New York City, for defendant Stephens.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Defendants' remaining pretrial motions are hereby resolved.

*Motions to Sever Defendants*

Defendants Stephens and Roland move for separate trials of the charges contained against them in this indictment.

Stephens concedes that his motion is premature, but raises the issue before trial, pursuant to Rule 12(b)(5), F.R.Crim.P., to preserve the point in case sufficient grounds for severance appear as the joint trial begins. His motion is denied at this time, without prejudice to renewal at trial.

■ Roland's contention that the charges against her are misjoined with the charges against the other defendants, under Rule 8(b), F.R.Crim.P, is unavailing. She asserts "that she is unaware of any transactions with any of the victims of the fraudulent scheme except possibly Simone Putnam" (Roland brief at 5), and that "there will be absolutely no evidence that

will connect her with the Defendants Sidney Jones, Derek Blackmon, Larry Ogletree, . . . or their illegal activities." (Brief at 3). The indictment, however, charges Roland with having participated in substantive offenses involving seven of the nine actual or intended victims; she is named in 24 of the 35 counts. "In the absence of an argument of prosecutorial bad faith . . ., allegations of an indictment will be accepted as true in deciding a rule 8(b) motion." *United States v. Levine*, 546 F.2d 658, 663 (5th Cir.1977). As an alleged coconspirator, Roland is properly joined in the indictment. *United States v. Barlin*, 686 F.2d 81, 91 (2d Cir.1982). Her motion for severance on grounds of misjoinder is denied, without prejudice to renewal during trial.

■ Roland's motion for discretionary severance under Rule 14, F.R.Crim.P., is also denied for failure to show that she would be substantially prejudiced by a joint trial with her alleged co-conspirators. Her conclusory and speculative statement that it is "highly possible" that her defenses may be antagonistic to those of her co-defendants (Brief at 9) falls far short of the showing required for severance. "Where the defendant fails to 'show the nature of his defense . . . and in what respect, if any, his defense is inconsistent with or antagonistic to that of his co-defendants' there is no basis for severance." *United States v. Wheaton*, 463 F.Supp. 1073, 1077 (S.D.N.Y.), *aff'd mem. sub nom. United States v. Williams*, 614 F.2d 1293 (2d Cir.1979), citing *United States v. Marquez*, 319 F.Supp. 1016, 1018 (S.D.N.Y.1970). Her equally speculative assertion that she might wish to testify with regard to certain counts but not others provides no basis for severance in the absence of a particularized showing of the testimony she wishes to give on one or more counts, and her reasons for remaining silent on the joined counts. *United States v. Werner*, 620 F.2d 922, 930 (2d Cir.1980). Roland's claim that her defense may be impaired "in the event a codefendant possesses exculpatory information" with regard to her but that co-defendant would refuse to testify at a joint trial (Brief

at 10) is similarly unsupported by an adequate factual showing, *United States v. Bari,* 750 F.2d 1169, 1177 (2d Cir.1984), *cert. denied sub nom. Benfield v. United States,* 472 U.S. 1019, 105 S.Ct. 3482, 87 L.Ed.2d 617 (1985), as is her claim that severance is required under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Given the extensive participation of Roland in the fraudulent scheme which is alleged in the indictment, severance is not required at this time on the ground that she is a mere minor and peripheral participant in the scheme who would be subject to the prejudicial spillover effect of evidence concerning the extensive involvement of her co-defendants. *Compare, United States v. Kelly,* 349 F.2d 720, 756 (2d Cir.1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). Roland's contention that the proof at trial may show multiple separate conspiracies rather than the single conspiracy alleged in the indictment is an argument properly made at the conclusion of the Government's case-in-chief, not in a pretrial motion. Finally, I see nothing inherently prejudicial to Roland if the jury learns that a co-defendant, Tyrone Stephens, is the father of one of her children. No rule forbids family members charged in the same indictment from being tried together. *See, e.g., United States v. Potamitis,* 739 F.2d 784 (2d Cir.) *cert. denied,* 469 U.S. 934, 105 S.Ct. 332, 83 L.Ed.2d 269 (1984) and *cert. denied sub nom. Argitakos v. United States,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984) (father and son); *United States v. Carson,* 702 F.2d 351, 367 (2d Cir.), *cert. denied sub nom. Mont v. United States,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983) (two brothers); *United States v. Barton,* 647 F.2d 224, 241 (2d

Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981) (husband and wife). For the foregoing reasons, Roland's motion for severance under Rule 14 is denied, without prejudice to renewal at trial.

*Motions to Sever Offenses*

Defendants move to sever the trial of Counts 31–35 from the trial of Counts 1–30 on grounds of misjoinder, under Rule 8(b), F.R.Crim.P., or prejudicial joinder, under Rule 14, F.R.Crim.P.[1]

*Misjoinder*

Defendants initially contend that Counts 31–35 are not part of "the same series of acts or transactions" as the first 30 counts of the indictment, as required for proper joinder by Rule 8(b).[2]

The first count in the indictment charges all defendants with conspiring to obtain money from certain elderly women by various fraudulent means. It is alleged that the objectives of the conspiracy included the unlawful possession of credit cards and identification documents. (Indictment ¶¶ 1(c) and (d)) Counts 31 and 32 charge two of the alleged co-conspirators, Sidney Jones and Derek Blackmon, with having committed those particular substantive offenses. It appears that the Government's theory is that Jones and Blackmon committed those offenses in furtherance of the conspiracy charged in Count One, especially since one of the overt acts alleged in the conspiracy count is the substantive offense charged in Count 31.

"[J]oinder of a conspiracy count and the substantive counts arising out of the conspiracy is proper since the charge of conspiracy provides a common link and demonstrates the existence of a common

---

**1.** All defendants except Blackmon move for severance of Counts 31–35. Blackmon moves only for severance of Counts 33–35.

**2.** Defendants have correctly made their motions pursuant to Rule 8(b), entitled "Joinder of Defendants," rather than Rule 8(a), entitled "Joinder of Offenses." "When a defendant in a multiple defendant case challenges joinder of offenses, ... his motion is made under Rule 8(b) rather than Rule 8(a), *United States v. Papadak-*

*is,* 510 F.2d 287, 300 (2d Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975), and the question is whether the codefendants 'participated in the same series of acts or transactions constituting an offense or offenses.'" *United States v. Turbide,* 558 F.2d 1053, 1061 n. 7 (2d Cir.), *cert. denied,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977), quoting *King v. United States,* 355 F.2d 700 (1st Cir.1966).

plan." *United States v. Bernstein,* 533 F.2d 775, 789 (2d Cir.) *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976); *see also, United States v. Persico,* 621 F.Supp. 842, 851 (S.D.N.Y.1985). It matters not that only Blackmon and Jones are charged in Counts 31 and 32. Rule 8(b) expressly states that "all of the defendants need not be charged in each count." Joinder is appropriate where some, but not all, of the defendants participated in certain acts or transactions, but those activities were undertaken in furtherance of the larger conspiracy with which all defendants are charged. *See, e.g., Barton, supra,* 647 F.2d at 239–240; *United States v. Weisman,* 624 F.2d 1118, 1129 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980); *Persico, supra,* 621 F.Supp. at 851. Ogletree's contention that there is no proof establishing that the other defendants knowingly agreed that those activities (i.e. unlawful possession of such materials) were objectives of the conspiracy is an argument better made at trial. *See Levine, supra,* 546 F.2d at 663. I therefore conclude that Counts 31 and 32 are properly joined under Rule 8(b).

Count 33 charges that on November 7, 1985, immediately after his arrest and the termination of the alleged conspiracy, defendant Blackmon submitted a false financial affidavit to this Court in order to obtain court-appointed counsel. The indictment alleges that Blackmon falsely stated that he had "no cash on hand" when in fact he had approximately $41,000 in cash in a safe deposit box at a local bank. Count 34 charges that the next day, on November 8, 1985, defendant Jones traveled to Birmingham, Alabama to visit a safe deposit box there, in violation of a court order that he not leave the Southern and Eastern Districts of New York. The Government asserts that its proof at trial will show that money obtained from the fraudulent scheme charged in the indictment ("fruits of the conspiracy") was stored in these safe deposit boxes. The Government contends that Blackmon's post-conspiracy false statement and Jones' post-conspiracy disobedience of a lawful order were acts done in order to conceal the fruits of the fraudulent scheme.

The crucial question is whether such acts of concealment may be said to be part of "the same series of acts or transactions constituting an offense or offenses" within the meaning of Rule 8(b).

█ Charges of attempted concealment or cover-up of a crime have been held to be sufficiently connected with the crime itself to permit joinder under Rule 8(b), which governs the joinder of offenses against a single defendant. *See United States v. Carson,* 464 F.2d 424, 436 (2d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972); *United States v. Sweig,* 441 F.2d 114, 118–19 (2d Cir.), *cert. denied,* 403 U.S. 932, 91 S.Ct. 2256, 29 L.Ed.2d 711 (1971). Although the standard for joinder under Rule 8(b) is "more restrictive" than the Rule 8(a) standard, *United States v. Weiss,* 491 F.2d 460, 467 (2d Cir.), *cert. denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974); *United States v. Granello,* 365 F.2d 990, 993–94 (2d Cir.1966), *cert. denied,* 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967), joinder of similar charges has also been approved in the Rule 8(b) context. *See, e.g., Potamitis, supra,* 739 F.2d at 791; *United States v. Kopituk,* 690 F.2d 1289, 1313–14 (11th Cir.1982), *cert. denied sub nom. Williams v. United States,* 461 U.S. 928, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983) and *cert. denied,* 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983); *United States v. Carmichael,* 685 F.2d 903, 910 (4th Cir.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1187, 75 L.Ed.2d 434 (1983); *United States v. Barney,* 568 F.2d 134, 135–36 (9th Cir.), *cert. denied,* 435 U.S. 955, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978); *United States v. Nelson,* 606 F.Supp. 1378, 1387–88 (S.D.N.Y.1985); *United States v. Hilliard,* 436 F.Supp. 66, 74 (S.D.N.Y.1977); *cf. United States v. Weiss,* 491 F.2d 460, 467 (2d Cir.), *cert. denied,* 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974). Since the Government contends that Jones' trip to Birmingham and Blackmon's allegedly false statement will both be shown to be directly connected

to the underlying scheme to defraud, Counts 33 and 34 are not misjoined under Rule 8(b).

■ The same cannot be said of Count 35, which charges Jones and Blackmon with possession of cocaine. The cocaine that is the subject of this charge was allegedly seized in the search of the Mosholu Parkway apartment, in which evidence and paraphernalia relating to the confidence scheme were also seized. The Government does not assert that the cocaine played any role in the scheme to defraud or that it bears any relation whatsoever to the charges contained in the remaining counts; consequently, it cannot be said to be part of "the same series of acts or transactions" as the scheme to defraud that is the subject of this indictment. It is therefore misjoined and must be severed. *Hilliard, supra,* 436 F.Supp. at 72.

### Prejudicial Joinder

Defendants move for discretionary severance of Counts 31–34 under Rule 14, F.R. Crim.P., on the ground that the cumulative effect of these allegedly "unrelated" charges involving only Jones and Blackmon is creation of a risk that the jury will infer a criminal disposition on the part of those two defendants and find the other defendants guilty by association with them. The motion is denied.

■ Counts 31 and 32, which allege commission by Jones and Blackmon of substantive crimes in furtherance of the conspiracy with which all defendants are charged in Counts 1–30, can hardly be said to be unrelated; they are part and parcel of that scheme and are properly tried together with those counts. There is nothing inherently inflammatory or prejudicial about the evidence that will be introduced to prove those charges, i.e., identification documents and credit cards. Moreover, the nature of those charges, i.e., unlawful possession, is sufficiently simple that I am confident that with appropriate instructions from the Court, the jury will be able to compartmentalize the evidence as appropriate and render a fair verdict against each defendant individually.

■ Counts 33 and 34 concern post-conspiracy acts by Jones and Blackmon allegedly done to conceal the fruits of the conspiracy. The indictment does not allege, nor does the Government now assert, that those acts of concealment were objectives of the conspiracy. Whether evidence concerning those acts will be admissible only against those two defendants or also against the remaining co-conspirators is a matter of dispute between the Government and defense counsel. Nevertheless, "the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." *Carson, supra,* 702 F.2d at 367; *United States v. Losada,* 674 F.2d 167, 171 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). "The test is whether under all the circumstances of a particular case, the jurors have the capacity to follow the trial court's instructions and 'appraise the independent evidence against each defendant solely upon that defendant's own acts, statements and conduct." 8 *Moore's Federal Practice* ¶ 14.04[1] at 14–41 (1985). Much of the evidence that the Government will seek to offer in support of Counts 33 and 34 will be admissible against Blackmon and Jones respectively to prove their participation in the conspiracy alleged in Counts 1–32. Whatever additional evidence will be required to prove the charges in Counts 33 and 34 appears to be sufficiently simple and distinct that the jury will not be unduly confused. Should the likelihood of confusion become apparent during the course of the trial, counsel may renew their motions for severance of these counts at that time.

■ I view as unrealistic and improbable Blackmon's fear of spillover prejudice from Count 33 on the ground that the jury will become aware that he "has been provided with a free attorney, in fact two free attorneys, at the expense of the taxpayers." (Letter from Blackmon's counsel dated May 13, 1986). In a very real sense, every prosecution and possible conviction costs the taxpayers money, but one would

ordinarily not expect the jurors to consider that fact in assessing a defendant's guilt or innocence, and I see no reason to expect that they will do so here.

In sum, Count 35 is severed for separate trial on grounds of misjoinder under Rule 8(b), F.R.Crim.P. Defendants' motions to sever Counts 31–34 are denied without prejudice to renewal during the course of trial.

*Motions to Dismiss Count 5*

Ogletree and Stephens join in the motion of Jones to dismiss Count 5 on the authority of *United States v. Archer*, 486 F.2d 670 (2d Cir.1973). For the reasons stated in the Court's earlier opinion dated April 9, 1986, denying Jones' motion, (slip op. at 3) [Available on WESTLAW, DCTU database], the motion is denied at present, without prejudice to renewal at trial.

*Suppression Motions*

Various defendants move to suppress pretrial identifications made from photospreads or from a voice spread, and to suppress certain telephone records.

*Suppression of telephone records*

Ogletree moves to suppress the telephone records of a Wilma Moss. Moss and Ogletree were co-owners at one time of a house located in Queens. Ogletree asserts that the Government learned of the existence of Ms. Moss only through information disclosed by Ogletree at his pretrial services interview prior to arraignment on these charges. He states that he was promised that information provided by him at that time would not be used against him "in any way" to establish his guilt or lack of guilt, and that the Government's use of these telephone records stems from a breach of that promise.

In response, the Government has submitted a copy of a grand jury subpoena *duces tecum* dated January 14, 1986, requesting telephone records from January 1, 1985 to the date of the subpoena for, *inter alia,* the telephone number assigned to Wil-

ma Moss. (Government's Supplemental Brief, Exhibits 1 and 2).[3] The subpoena was returnable on January 28, 1986. Ogletree was not indicted until February 25, 1986. His pretrial services interview occurred in mid-March. In consequence, it cannot be said that the Government's initial interest in these telephone records was the result of its improper use of the privileged information given by Ogletree to pretrial services.

The subpoena also requested the subscriber information for that telephone number, which would have revealed to the Government the existence of Ms. Moss. Nevertheless, Ogletree argues that even with an interest in that telephone number and knowledge that it was assigned to Ms. Moss, the Government might not have been able to connect that information to him were it not for his disclosures concerning Ms. Moss in his pretrial services interview; thus the link that demonstrates the relevance of those records to Ogletree may be the privileged information.

On the record as it now stands, I cannot determine whether Ogletree's fears are groundless or well-founded. Therefore, if the Government intends to connect these telephone records at trial to Mr. Ogletree, I direct the Assistant United States Attorney in charge of this prosecution to submit an affidavit explaining how the Government made that connection and the source of the information upon which it relied. The affidavit must be served and filed not later than the close of business on June 6, 1986.

Decision on Ogletree's motion to suppress the telephone records of Wilma Moss is reserved pending receipt of the Government's affidavit.

*Suppression of Photographic Identifications*

Defendants Ogletree and Stephens contend that photospreads from which they were identified were so "impermissibly suggestive" as to create a substantial like-

---

**3.** Ogletree evidently misreads the subpoena as requesting records only from November 1985 (11/85) to the date of the subpoena. But it is clear that the subpoena requests records "from 1/1/85 to present."

lihood of misidentification, requiring suppression of evidence concerning those identifications under *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968).

In an earlier opinion in this action considering similar motions on behalf of co-defendants Jones and Blackmon, I reviewed the relevant authorities and standards which govern analysis of such claims (Memorandum Opinion and Order dated April 9, 1986 at 16–20). That discussion is incorporated by reference herein and will not be repeated in full.

*Stephens*

Stephens is one of six black males who appear in photospread number three; his picture has been placed in the upper right-hand corner of the spread in position number three. He claims that the suggestiveness of the photospread stems from the fact that he is the only light-skinned and pock-marked individual in the array; that he appears to be noticeably older than the other individuals; that his hair and hair style is noticeably different; and that there is a difference in the quality of his photograph and skin tone. (Brief at 4–5).

 After carefully reviewing the array, I cannot agree that the quality of Stephens' photograph and skin tone distinguish him in any way from the other individuals pictured. In fact, each picture in the photospread differs from the others in terms of its color, tone, hue and quality. Nor can I agree that he is readily distinguishable from the others by age. All six individuals appear to be approximately the same age as Stephens. *Cf. United States v. Mefford,* 658 F.2d 588, 590 (8th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982) (photospread held "not unnecessarily suggestive" in which defendant was one of possibly two individuals within age range described by witness and others pictured looked approximately 15 years younger).

The remaining differences identified by Stephens do not render the photospread "suggestive in the first instance," let alone "impermissibly so within the meaning of *Simmons.*" *United States v. Bubar,* 567 F.2d 192, 199 (2d Cir.), *cert. denied,* 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). All six individuals have little, if any, facial hair. They all have the same basic hair style (no noticeable part) in lengths that range from very short to moderate. Stephens' hair length falls somewhere in the middle; his hair length and style is virtually identical to that of the individual in position number one. It is true that Stephens appears to have lighter skin than the others, but the poor quality and tone of the picture suggests that his true skin color is probably a bit darker. If so, then his skin color more closely approximates that of at least one other individual in his array. Stephens' pock-marks are not glaringly apparent. To the extent that they are noticeable at all, their potential suggestiveness is blunted by the fact that two other individuals in the array also appear to have skin problems: number five appears to have a couple of scars and at least one small growth on his face; number one appears to have mild acne. *Cf. United States v. Abbate,* 451 F.2d 990, 992 (2d Cir.1971). In short, the small differences between Stephens and the others are not such "unnecessarily striking differences" that they cause Stephens' photograph to "stand out prominently" from the rest in an impermissibly suggestive fashion. *United States v. Harrison,* 460 F.2d 270, 271 (2d Cir.), *cert. denied,* 409 U.S. 862, 93 S.Ct. 152, 34 L.Ed.2d 110 (1972). Thus the need for a pretrial evidentiary hearing does not arise.

Stephens also moves to suppress an identification of him made by an employee at the Tuckahoe Motor Inn. The circumstances surrounding that identification are set forth in an affidavit of James Niemeyer, a Detective with the New York City Police Department Special Frauds Squad, dated May 9, 1986.[4] Niemeyer states that he

---

**4.** The relevant facts appear in the letter of AUSA Weiss to defense counsel dated April 23, 1986 at

2, incorporated by reference into the Niemeyer affidavit.

went to the inn without disclosing the purpose of his visit. He identified himself to a Laurie Crouch (the employee), showed her a "mug-shot" style photograph of Stephens (full-face and profile) labeled "Police Department, Warren, Michigan", and "without any introduction" asked if she recognized the man in the photograph. The employee identified Stephens as "Charles Reeves," a guest at the inn.[5]

██ In the absence of exigent circumstances, presentation of a single photograph to the victim of a crime amounts to an unnecessarily suggestive photographic identification procedure. *Bubar, supra,* 567 F.2d at 197. The Government does not suggest that any exigent circumstances prompted Niemeyer's presentation of the single photograph to Crouch. However, the Government seeks to distinguish the circumstances surrounding this identification from that of the ordinary photographic show-up in which a victim is shown a single photograph by a law enforcement official investigating a crime. In the ordinary situation, the danger of misidentification arises from the fact that the victim may assume that the single photograph displayed is that of the person who the police suspect committed the crime. Here, the Government contends, Crouch was a disinterested third-party who did not know that a particular crime was the subject of Niemeyer's inquiries. She had no reason to connect the photograph to any particular individual; in fact, she had not even been told that Niemeyer was looking for someone who had been or was a guest at the inn. The Government claims that in these circumstances, where for investigatory purposes a non-victim is shown a single photograph only to ascertain if that person recognizes the individual in the photograph, the procedure is not impermissibly suggestive.[6]

██ In point of fact, the procedure followed by Niemeyer was not suggestive at all in that due process context which generates judicial concern. Niemeyer simply showed Crouch a photograph and asked her if she recognized the subject for any reason. Crouch was free to answer "yes" or "no." The fact that she was shown only one photograph in no way "suggests," that is to say, tends to elicit, an affirmative response. We deal here with *recognition* in its most general sense. There is a quantum difference between that process and *identification* for a particular purpose, such as the identification of a perpetrator by his victim.

To be sure, Crouch presumably deduced that Niemeyer was conducting some sort of criminal investigation, rather than trying to trace a particularly generous contributor to the Police Benevolent Association. But that common-sense awareness is not suggestive of any particular answer on the question of recognition. If anything, Crouch's awareness of Niemeyer's general purpose would likely cause her to be careful before saying she recognized the man in the photograph. In any event, there is simply no meaningful resemblance, in due process terms, between showing a single photograph to a victim and asking: "Is this the man?"; and showing a single photograph to a third party such as Crouch and asking: "Do you recognize this man?"

No hearing is necessary on this issue. Stephens' motion to suppress his pretrial identification by Crouch is denied.

That portion of Stephens' motion seeking additional discovery concerning his identification in advance of an evidentiary hearing is denied as moot.

*Ogletree*

Ogletree is one of six black males who appear in photospread number five; his

5. The indictment alleges that "Charles Reeves" was an alias used by Tyrone Stephens.

6. I find unpersuasive, although I need not reach, the Government's attempt to find support for its argument in analogies drawn from cases in which a witness accidentally confronted and identified a defendant out-of-court, yet the iden-

tification was not suppressed. There is a suggestion in those cases that if the confrontation had been "arranged" by the Government, the courts would have taken a different view of the matter. *See, e.g., United States v. DiStefano,* 555 F.2d 1094, 1102 (2d Cir.1977).

picture has been placed in the lower left-hand corner—the number four position.

I do not find the difference between Ogletree's skin color or hair style and those of the five other individuals significant, much less impermissibly suggestive. Although Ogletree's skin appears to be slightly lighter than that of at least two others and significantly lighter than that of the other three, the variations in the tone and hue of all six photographs minimizes possible reliance on such differences as a distinguishing characteristic. Moreover, at least one victim who identified Ogletree from the photospread stated, correctly, that his skin was actually darker than it appears to be in the photospread. Thus, to the extent that Ogletree appeared to have lighter skin than the others, he was less likely to be identified. The fact that Ogletree's hair is shorter than that of the others and that he is the only one who is noticeably balding is not sufficient to render the photospread unduly suggestive. *See United States v. Shakur*, 560 F.Supp. 353, 355 n. 2 (S.D.N.Y.1983) (defendant's complaint that he was the only one with a "noticeably receding hairline" deemed "neither weighty nor adequate").

Ogletree also objects to the procedure whereby at least one of his identifications was obtained. In a letter to defense counsel dated April 23, 1986, the Government stated that after one of the victims, Josephine Palumbo, identified Ogletree from photospread number five, she was shown another photograph. The second photograph, referred to by counsel as the "tuxedo" photograph, is an approximately 8" × 10" color picture of Ogletree, Stephens, Jones and an unidentified fourth male. All four appear to be dressed in tuxedos, caught in an informal pose at some sort of festive occasion. Ms. Palumbo identified Ogletree in the tuxedo photograph as well.

Ogletree's objection to this procedure is that he is the only person who appears in both photospread five and in the tuxedo photograph. "Thus, using the two photospreads in combination was like showing Ms. Palumbo a single picture of Mr. Ogle-tree or arranging a showup." (Ogletree Brief at 15). Ogletree claims that this procedure unnecessarily signaled Ms. Palumbo that he was the suspect. Furthermore, Ogletree contends, the repeated viewing of Ogletree may have indelibly etched his face in Ms. Palumbo's memory, thus tainting any in-court identification she may now seek to make.

The procedure followed is described in the letter of AUSA Weiss dated April 23, 1986, which reads in pertinent part:

"... Josephine Palumbo was shown photospread number 5 and identified Ogletree, saying however, that his skin was actually darker than appeared in the photospread. She was then shown the 'tuxedo' photograph, number 7, and identified Ogletree."

If it is the fact that Ms. Palumbo was not shown the "tuxedo" photograph until she had identified Ogletree from the entirely proper, non-suggestive photospread. Ogletree's arguments concerning the "tuxedo" photograph have no substance. Once law enforcement officers obtain from a witness a photographic identification of a suspect which is both untainted and positive, they may show other pictures of that properly and positively identified suspect to the witness without implicating the concerns of *Simmons* and its progeny. Of course, if the witness had failed to identify Ogletree until the photospread had been followed by the "tuxedo" picture, different considerations would arise. *Cf. United States v. Bowie*, 515 F.2d 3, 7 (7th Cir.1975), ("If the displays had been viewed by the witnesses at the same time and they had been able to make an identification only after they had compared the displays and realized that only one man appeared in both, there would be good cause to suspect the reliability of identifications.").

Unlike other situations, where agents' affidavits were produced, the only narrative of these particular events appears in the prosecutor's letter. I mean no disrespect of Mr. Weiss when I say that is not enough. In view of the nearness of trial, and in lieu of an affidavit, the agent

whose report underlies counsel's account must testify at the hearings during the week of June 9.

Ogletree also moves for suppression of identifications made of alleged co-conspirators Cecilia Roland and Gloria Rembert. Roland, a co-defendant, has not filed a motion on her own behalf to suppress those identifications. Rembert, a former co-defendant whose trial has been severed because she is a fugitive, obviously has made no such motion either. Ogletree claims that he has "standing" to seek suppression of any identification made of them because evidence concerning those identifications will be admissible against him at trial in connection with the conspiracy charge. He claims that he seeks only to assert his own due process right to be protected from admission against him of evidence so unreliable that it deprives him of a fair trial. *Simmons, supra; Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972–73, 18 L.Ed.2d 1199 (1967).

Ogletree's contention, if sound, would vest every participant in an alleged conspiracy with vicarious standing to assert any other participant's Fifth Amendment right to a "reliable" identification *of that other participant,* even where (as in the case of co-defendant Roland) that other participant makes no constitutional claim of her own. No case cited by counsel or discovered by the Court's own research paints with so broad a brush. The trend of appellate authority is against the vicarious assertion of a co-defendant's constitutional rights; see *Bryson v. United States,* 419 F.2d 695 (D.C.Cir.1969) (appellant lacked standing to contest admissibility of photographic identification of him obtained as fruits of a co-defendant's unconstitutional confession).

The parties debate the effect of the Second Circuit's *per curiam* decision in *Romano v. United States,* 460 F.2d 1198 (2d Cir.), *cert. denied,* 409 U.S. 915, 93 S.Ct. 237, 34 L.Ed.2d 177 (1972). In *Romano,* the appellant claimed that an impermissibly suggestive pretrial confrontation between two prosecution witnesses tainted an in-court photographic identification of one

witness by the other. The appellant argued that "this confrontation was in violation of his constitutional rights as enumerated in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) and *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)." *Id.* at 1199. The Second Circuit rejected Romano's claims in these words:

> "None of appellant's constitutional rights were violated when these two witnesses met at an interview before trial. Appellant's right to counsel does not extend to the government's interviewing of witnesses in preparation of its case when the appellant was not even present at this meeting." *Ibid.*

Ogletree argues that *Romano* is inapposite because all appellant did was to raise "a Sixth Amendment right to counsel at confrontations with witnesses, not due process questions about reliability." Reply brief at 8. I cannot accept that characterization, since *Stovall v. Denno,* which the *Romano* court listed as one of the bases of appellant's claims, involved a defendant's Fifth Amendment right to due process in admission of identification testimony. It is unlikely that a panel consisting of Judges Friendly, Moore and Anderson missed that point; and they then proceeded to hold that "[n]one of appellant's constitutional rights were violated," speaking in the plural. What is not so clear from the court's brief discussion is whether Romano lost his Fifth Amendment claim from lack of standing or lack of merit, although the tenor of the opinion does seem to point toward the former. It must also be recognized that *Romano* involved the photographic identification of a witness, and not a codefendant.

■ In my view, *Bryson* is closer authority on the standing issue; and in its light, together with the cases it cites, and the absence of any case law supporting Ogletree's contention, I conclude that he lacks standing to constitutionally challenge the identification of individuals other than himself. I am enforced in that conclusion

by the fact that identification of Roland or Rembert furnishes no direct evidence against Ogletree. Those identifications become inculpatory of Ogletree only if the Government, by other evidence, shows that Ogletree and those other individuals participated together in a common scheme. *Stovall v. Denno,* upon which Ogletree places primary reliance, turned on in-court identification of the defendant himself.

### Jones and Blackmon

In my Memorandum Opinion and Order of April 9, 1986, I reserved decision on the motions of Jones and Blackmon to suppress pretrial identifications made of them, pending submission of certain affidavits which I required to determine if an evidentiary hearing was required. (Slip op. at 22–23) Those affidavits have now been filed and I make the following rulings:

(1) An evidentiary hearing will be required to explore the suggestiveness of the procedure by which Blackmon was identified by Gloria Rosenfeld on November 8, 1985, and by Chris Watson on November 19, 1985. Jones' motion to suppress Rosenfeld's and Watson's photospread identification of him is denied; no need for an evidentiary hearing in respect of his identifications arises because Jones was in the first photospread shown and I have found that photospread not impermissibly suggestive.

(2) An evidentiary hearing will also be required to explore the circumstances surrounding the identification of Blackmon by Hadassah Feit on November 12, 1985, because it cannot be determined at this time in which order the Jones' and Blackmon photospreads were shown to Ms. Feit.

(3) No evidentiary hearing is required concerning the photographic identifications of Jones made by James DeFino, Nicole Felton, Rene Bittar and Antoinette LoGuidice on November 19, 1985 because Jones was in the only photospread shown and the array itself was not impermissibly suggestive. His motion to suppress those identifications is denied.

### Jones

Jones moves to suppress a photographic identification made of him by Louise Simonetii, an employee of the Southtrust Bank in Birmingham, Alabama, that was made from a third photospread (# 1C). He challenges the identification as impermissibly suggestive on the same grounds raised in his original motion to suppress the identifications made from photospreads # 1A and # 1B. (See Memorandum Opinion and Order of April 9, 1986 at 15–16). After reviewing photospread # 1C, I find that its composition is not unduly suggestive for the reasons stated in my earlier opinion in connection with photospreads # 1A and # 1B. The suggestiveness concern I did express in that opinion, based on the manner in which photospreads containing Jones picture may have been presented to witnesses also viewing photospreads containing Blackmon's picture, does not arise in respect of photospread # 1C. (See report of FBI Special Agent Joseph V. Walsh, Jr. dated November 26, 1985 attached to letter of AUSA Weiss to defense counsel dated May 7, 1986).

The motion is denied.

### Blackmon

Blackmon claims that statements made by government agents to witnesses who have identified him from photospreads, suggesting that their pretrial identifications were correct, have impermissibly "tainted" those identifications. The statements to which he objects are contained in letters from FBI Supervisory Special Agent Gregory Dean Meacham to the various alleged victims of the confidence scheme. In a letter addressed to the victim herself, Meacham states: "[Y]our testimony in this matter is critical in successfully prosecuting the individuals who have defrauded you." A second enclosed letter states in pertinent part: "The Federal Bureau of Investigation (FBI) has apprehended the perpetrators and is attempting to bring them to trial in June, 1986." Blackmon contends that for the reasons set forth in *United States v. Jarvis,* 560 F.2d 494, 500 (2d Cir.1977), *cert. denied,* 435 U.S. 934, 98

S.Ct. 1511, 55 L.Ed.2d 532 (1978), the Government's conduct has created a danger of irreparable taint by suggesting to individual victims who have made identifications that their choice was correct, and by giving each witness the impression that other witnesses have identified the same persons. The Government has not responded to this claim.

In *Jarvis,* the Second Circuit expressly stated that it "do[es] not approve the practice apparently employed here by the FBI of informing potential witnesses of the 'correctness' or 'incorrectness' of their pretrial identifications. Such practices might well so taint an identification as to require reversal." 560 F.2d at 500. However, the *Jarvis* court noted, "no significant likelihood of misidentification" arises from such improper comments reinforcing an initial identification, with regard to that identification or identifications subsequently made by that witness, if the initial identification was "certain." *Id.* at 499.

 Blackmon was identified by two victim witnesses: Gloria Rosenfeld and Hadassah Feit. The New York City Special Frauds Squad detective who obtained Ms. Rosenfeld's identification of Blackmon has submitted an affidavit stating that Rosenfeld "said that the photograph of Blackmon had a 90% resemblance to Frank Roberts, the other individual whom she encountered on the street." (Condon affidavit dated April 21, 1986 at ¶ 4). As the Government itself admits, this constitutes a "less than positive identification." (Letter of AUSA Weiss to defense counsel dated April 23, 1986). An evidentiary hearing to explore the possibility of taint due to the Government's improper reinforcing comments of Ms. Rosenfeld's identification is therefore required. In contrast, the affidavit of the FBI Special Agent who obtained Feit's identification of Blackmon states unequivocally: "Mrs. Feit *positively identified* Derek Blackmon as the chauffeur Ricky Davis whom she had previously described as having participated in the confidence scheme

that defrauded her of $200,000, and with whom she had been in close contact over a period of approximately four days." (Roth affidavit dated May 7, 1986 at ¶ 3). Since no substantial likelihood of misidentification arises from such a certain initial identification, *Jarvis, supra,* no evidentiary hearing is required in respect of Ms. Feit's identification.[7]

### *Motion to Suppress Voice Spread Identifications*

During the course of an undercover investigation into the confidence scheme charged in the indictment, the Government tape-recorded a number of telephone conversations between police officer Peggy Hopkins, acting in her undercover capacity as an intended victim of the scheme, and a "Mr. Goldberg," who the Government contends was Sidney Jones. A portion of one of those tape-recorded conversations was transcribed. Five men were then chosen to play the part of "Mr. Goldberg" by reading his part from the transcript while Ms. Hopkins recreated her role as the intended victim. Each recreated conversation took place, as did the original, over the telephone, and each was tape-recorded.

A "voice spread" was then created using the original recording and the five newly-created recordings. All six tapes were played for a number of the victims. The original recording, on which Jones voice is allegedly heard, was always played fourth. The victims were instructed to say nothing until they had heard all six tapes. All of the victims who heard the tape identified the voice in the fourth recording "with levels of certainty ranging from tentative to definite." (Affidavit of Richard V. Roth, FBI Special Agent dated May 12, 1986 at ¶ 7).

Jones moves for suppression of those identifications, claiming that the voice spread was so impermissibly suggestive that it gave rise to a substantial likelihood of irreparable misidentification in violation

---

**7.** For the reasons stated *supra* at 1571–1573, Blackmon lacks standing to challenge possible

tainted identifications of his co-defendants based upon Meacham's statements.

of his due process rights. *Simmons, supra*, 390 U.S. 377, 88 S.Ct. 967.

■ As a threshold matter, the Government opposes Jones' motion on the ground that in this circuit, voice identifications are not subject to the same challenges for suggestiveness as are photographic or line-up identifications. Instead, the Government contends, the admissibility of voice identifications is governed by Rule 901(b)(5), F.R. Evid., which permits admission "once a prima facie case of authorship is made out by the proponent ...; and the reliability of the identification is for the jury." *United States v. Albergo*, 539 F.2d 860 (2d Cir.), *cert. denied*, 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976). I disagree. Although the Second Circuit has never squarely held that the due process concerns implicated in *Simmons* and progeny apply equally to identifications of recorded voices and photographs, *cf. Brown v. Harris*, 666 F.2d 782, 786 (2d Cir.1981), *cert. denied*, 456 U.S. 948, 102 S.Ct. 2017, 72 L.Ed.2d 472 (1982), it has never confronted the issue in the context of a voice spread as opposed to a single tape-recording. In most of the cases cited by the Government, the prosecution has sought to introduce a surreptitiously recorded telephone conversation and has therefore called a witness to say in substance with regard to that tape recording: "I know the voice of John Jones and that is his voice on the tape recording." The real issue is authentication that the voice on the recording to be offered in evidence is that of the defendant—the quintessential Rule 901(b)(5) problem. With the voice spread here at issue, the question is not "Can the witness say that the voice on recording number four is that of Sidney Jones?"; rather the question is "Can the witness reliably say, after hearing all six recordings, which voice she has heard before?" The latter question is concerned not with whether the tape recording number four can be "authenticated" as the voice of Sidney Jones, but with whether it has been fairly chosen from among the others. If something in the composition or the manner of presentation of the voice spread impermissibly suggested to the witness which voice to choose, the same due process concerns arise as with, for example, a suggestive photo array. I therefore hold that identifications made from voice spreads or arrays are subject to same due process challenges on grounds of impermissible suggestiveness as any other form of pretrial identification. *Accord, United States v. Schultz*, 698 F.2d 365, 367–68 (8th Cir.1983); *United States v. Leitner*, Crim. no. 85–13, Transcript of proceedings on July 22, 1985 (D.N.J.) (J. Gerry). *Cf. United States v. Patton*, 721 F.2d 159, 162 (6th Cir.1983) (same due process principles apply to either visual or aural identification); *United States v. Pheaster*, 544 F.2d 353, 369 (9th Cir.1976), *cert. denied*, 429 U.S. 1099, 97 S.Ct. 1118, 51 L.Ed.2d 546 (1977) (same).

Jones contends that the voice spread here at issue is impermissibly suggestive because "the five other voices on the tapes sound nothing like the voice on the suspect tape. The voices are different in tone, in inflection, in diction, in accent, in speech pattern, in quality, in volume, in pronunciation, etc." (Krinsky affirmation at 2). Having listened carefully to each of the six tapes myself, I find that I cannot agree with that assessment.

Only one recording, number six, is significantly different from the remaining tapes in terms of quality: it is of very low fidelity and throughout the taped conversation there is a buzzing sound as well as background noise. Were number six the suspect tape recording, I would undoubtedly find the spread to be impermissibly suggestive.

But the suspect tape is number four and, with one exception that I will come to in a moment, I hear no differences in the five remaining recordings of the sort described by counsel for Jones that one could term "suggestive," much less impermissibly so. Of course, there are differences in the vocal styles and accents of each of the five male speakers. That is to be expected; voices, like faces, are relatively unique. Nevertheless, there is nothing so distinc-

tive about the voice on the suspect tape that the listener is "tipped off" or is deprived of a meaningful choice. Furthermore, the participants in the "recreated" conversations have played their parts well; each recording sounds as if it could have been a real telephone conversation. In consequence, there is nothing about the taped conversations themselves that is suggestive.

There is, however, one aspect of the presentation that is questionable. On two of the six tapes (numbers three and four), the recorded conversation is preceded by a period of extraneous and unidentifiable noises and sounds. On tape number three, the preliminary "static" lasts for a brief period of time (approximately 6 tape revolutions); then the conversation starts. On tape number four, the suspect tape, the preliminary "static" lasts for quite a period of time (approximately 82 tape revolutions), and includes two brief pauses or interruptions when nothing is heard. On the other four tapes, the conversation is the first thing one hears. If the victims for whom the voice spread was played became aware of that difference in the recordings, they may have inferred that tape number four was more likely to be the "real" recording and that the remaining recordings had been specially created for identification purposes.

That concern is not assuaged by the fact that such indicia of reality appear on tape number three as well; the period of extraneous noise on that tape is virtually inconsequential in comparison to that on the suspect tape.

In *Schultz, supra,* which also involved a voice spread created by the Government for identification purposes, the court noted "a marked difference in volume (in the tapes); the recordings of the five FBI agents' voices were loud and had good sound resolution, while the recording of the defendant's voice was soft, and there was a good deal of static or 'tape hiss' (during the conversation)." On the basis of these observations the court concluded: "Perhaps the difference in sound level and tape quali-

ty is completely innocent. We do know that the difference is pronounced, at least in the tapes' present condition, and if the difference was so great at the time of the lineup, there was certainly an impermissible level of suggestiveness." 698 F.2d at 367. *Id.* at 368.

Although the distinctive differences in *Schultz* occurred in the recorded conversations themselves whereas the suggestive material in the tapes at bar occurs on the recording only prior to the conversations, that preliminary suggestive matter, if heard by the victims, created the same risk of misidentification condemned in *Schultz.* Thus the manner in which the Jones voice spread was presented to the victims is a matter that must be explored in more detail at an evidentiary hearing.

For scheduling purposes, I direct that the government agents who played the voice spread for the victims be available to testify regarding this issue on Monday, June 9, 1986 at 10:00 a.m. After hearing their testimony, I will determine if further testimony from the victims themselves is required.

*Motion to Reconsider Denial of Suppression Motion as to Search of Apartment 23G*

Defendant Blackmon moves for reconsideration of my April 9 Memorandum Opinion and Order insofar as it denied in its entirety his motion to suppress items seized at Apartment 23G. The circumstances and warrant under which the challenged search was conducted are described in the April 9 Opinion, familiarity with which is assumed. Blackmon contends that some of the items seized in that search were not "paraphernalia," whose seizure was permissible under the terms of the warrant, but "evidence." Blackmon includes under "evidence" "wristwatches, cufflinks, keys, and hundreds of documents—love letters, bank records, telephone records, and notes jotted on the back of envelopes." (April 17, 1986 Eaton Letter at 1). The Government concedes that "some of the items seized" at the apartment are properly characterized as "evidence" rather than "paraphernalia,"

and does not challenge Blackmon's characterization of any of the foregoing items as evidence. However, the Government contends that these items are nonetheless admissible under the "plain view" doctrine.[8]

 When conducting a search pursuant to a search warrant, police may seize items not particularly described in the warrant if they are in "plain view." *United States v. $10,000 in United States Currency*, 780 F.2d 213, 216 (2d Cir.1986). The Government must meet a three-part test to introduce evidence proffered under the plain view doctrine.

"First, the initial intrusion must be justified by a warrant or by a recognized exception to the warrant requirement.... Second, the discovery of evidence must be truly inadvertent.... Third, it must be 'immediately apparent' to the police that the evidence inadvertently found incriminates the suspect."

*Id.* at 217 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)). " '[T]he incriminating nature of an object is generally deemed 'immediately apparent' where police have probable cause to believe it is evidence of a crime.' " *Id.* (quoting *United States v. Ochs*, 595 F.2d 1247, 1248 (2d Cir.1979)).

Blackmon places little emphasis upon the first prong, and rightly so. I have already held that the agents were justified in searching "the entire apartment" for the paraphernalia. (April 9 Op. at 7–9). "Paraphernalia" clearly included items which could easily have been found in small containers, such as cut-up paper the size of United States currency and bank wrappers. Similarly, narcotics could have been found anywhere in the apartment. Clearly, the warrant justified a thorough search of the whole apartment. *See, e.g., Mapp v. Warden*, 531 F.2d 1167, 1172 (2d Cir.), *cert. denied*, 429 U.S. 982, 97 S.Ct. 498, 50 L.Ed.2d 592 (1976).

 The second prong, "inadvertent" discovery, presents more difficult questions. "Inadvertent" means "without premeditation or prior intention." *$10,000, supra*, 780 F.2d at 217. In *$10,000*, the Second Circuit "examine[d] the degree of expectation required to make discovery inadvertent":

"A search warrant must be obtained for incriminating evidence which the government believes will be found and for which it has probable cause. Where the police 'know in advance' that certain evidence is present and intend to seize it, yet fail to particularize it in their warrant application, their actions 'fly in the face of the basic rule that no amount of probable cause can justify a warrantless seizure.' "

*Id.* at 218 (quoting *Coolidge, supra*, 403 U.S. at 471, 91 S.Ct. at 2041). Thus before admitting such "plain view" evidence, the Court must make a finding that the police action, "when fully viewed," was in good faith. *Id.* at 219.

In my view, *$10,000* means that an evidentiary hearing is required in this case on the inadvertence question. The Government must come forward with proof that the items it seeks to introduce under the "plain view" doctrine were obtained in good faith. Defendant is entitled to cross-examine any witnesses the Government might offer. Accordingly, a hearing will be required on the inadvertence issue.

I also believe a hearing is required on issues presented by the third prong of the *Coolidge* test, articulated in *$10,000*. The Government must show it was "immediately apparent" to the police that the items found in "plain view" were incriminating— that is, that the police had probable cause to believe they were evidence of a crime. *Id.* at 217, 220. The officers need not, of course, have been " 'absolutely certain' " that they had evidence of a crime before them; and they were entitled, assuming

---

**8.** The Government appears to have abandoned its contention that the non-paraphernalia "evidence" was within the scope of the warrant. In any case, the word "evidence" only appears in the affidavit accompanying the search warrant, and I have already held that the affidavit was not incorporated into the warrant. April 9 Opinion at 8 & n. 2.

they lawfully came into possession of the items, to conduct a "limited inspection" of the objects. *United States v. Ochs,* 595 F.2d 1247, 1258 (2d Cir.1979) (Friendly, J.). Thus, a "brief perusal" of documents to determine their relevance is permissible. *See, e.g., United States v. Panza,* 750 F.2d 1141, 1151–52 (2d Cir.1984).

Here, there is simply no evidence in the record whether, measured by these standards, the incriminating nature of the "plain view" items was "immediately apparent." It is not "immediately apparent" to this Court, for example, that wristwatches or cufflinks are incriminating at all. Nor is there any evidence whether only a "brief perusal" of each of the documents seized was undertaken, or whether such a limited inspection of the documents would have revealed that they were incriminating. *See United States v. Strand,* 761 F.2d 449, 454 (8th Cir.1985) (government must establish applicability of plain view doctrine for each item seized).

For the foregoing reasons, defendant Blackmon's motion for reconsideration is granted, and a hearing will be held as indicated herein.

*Motions to Strike Aliases*

In my April 9 Memorandum Opinion and Order, I reserved decision on Blackmon's motion to strike the alleged aliases "Ricky Davis" and "Frank Roberts" from Counts 30–33 and Counts 35 of the indictment, pending receipt of an affidavit from AUSA Weiss explaining the relevance of those aliases to the crimes charged. I am satisfied after reviewing that affidavit that those aliases appear to have relevance to the Government's proof at trial on those charges. Blackmon's motion to strike is denied, without prejudice to renewal at the close of the Government's case-in-chief if the Government's evidence fails to make the necessary connection.

The motions of Ogletree and Stephens seeking to have their aliases stricken from the indictment are also denied, without prejudice to renewal at trial, on the basis of the authorities set forth in the April 9 Opinion at 12–13, the affidavit of AUSA Weiss dated April 16, 1986, and the Government's representation in its brief at 14 that all of the aliases of Stephens and Ogletree listed in the indictment are relevant to the proof the Government will offer at trial.

*Motions to Unseal Correspondence*

Defense counsel have asked for copies of letters sent to the Court by several alleged victims. Some of those letters were accompanied by letters from the victims' personal physicians or counsel.

I had not anticipated that such correspondence would be sent directly to me. The letters were generated by my direction to the Government to develop evidence concerning the victims' physical and mental conditions, within the context of the Government's application for a trial date as quickly as possible, and defendants' contention that the trial be postponed until the fall. I had thought the responses would be funnelled through the Government, but got some direct mail myself.

 I have no doubt that the victims and their physicians and counsel believed they were writing to the Court in confidence. Nevertheless, I regard such correspondence as falling within the spirit, if not the letter, of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Accordingly a defendant would be entitled to pre-trial disclosure of any material which is exculpatory of him, or tends to impeach the victim's inculpatory testimony.

I have carefully reviewed all these letters in the light of *Brady,* whose boundaries were further clarified in *United States v. Agurs,* 427 U.S. 97, 107–08, 96 S.Ct. 2392, 2399–400, 49 L.Ed.2d 342 (1976). My particular focus was upon evidence of deficient eyesight or failed memory: these being key elements where issues of identification abound. Nothing in these letters requires disclosure under *Brady,* for these or any other reasons.

The Government is required, of course, to make a similar evaluation of any material it received as part of this exercise, which the Court did not receive.

Defense counsel also seek to examine these letters to decide for themselves—as I have previously decided—that the victims' responses supported the Government's conclusion that trial should not be further delayed. I decline to breach the confidentiality of this correspondence for that purpose. The letters will be kept under seal, and the point is preserved for possible appellate review.

*Conclusion*

The Court has carefully considered every issue and argument raised by defendants' motions. Except as specified herein, defendants' motions are denied. An evidentiary hearing will be held beginning on Monday, June 9, 1986 at 10:00 a.m. in Courtroom 307, addressing those issues as to which an evidentiary hearing has been expressly granted in the foregoing opinion.

It is SO ORDERED.