**UNITED STATES of America**

v.

**Raymond Luc LEVASSEUR, Patricia Gros Levasseur, Barbara J. Curzi–Laaman, Richard Charles Williams.**

**Crim. A. No. 86–180–Y.**

United States District Court,
D. Massachusetts.

Jan. 5, 1989.

Robert Mueller, Washington, D.C., Michael Loucks, Boston, Mass., and William D. Braun, Washington, D.C., for U.S.

Peter Avenia, Gombiner & Avenia, New York City, for Raymond Luc Levasseur.

Owen Walker, Boston, Mass., William Newman, Northampton, Mass., Lewis Gerwitz, Winthrop, Mass., and Elizabeth Fink, Brooklyn, N.Y., for Patricia Helen Gros.

Kenneth King, Jamaica Plain, Mass., William M. Kunstler, New York City, Elizabeth O'Connor Tomlinson, Buckingham, Pa., Ronald L. Kuby, New York City, for Thomas William Manning.

Elizabeth Fink, Brooklyn, N.Y., for Carol Ann Manning.

Steven Schlang, Northampton, Mass., Daniel Meyers, New York City, for Jaan Karl Laaman.

Linda Thompson, Springfield, Mass., for Barbara J. Curzi.

Robert J. Boyle, Brooklyn, N.Y., for Richard Charles Williams.

Barry P. Wilson, Wilson & Schneider, Boston, Mass., for Christopher Everett King.

## MEMORANDUM AND ORDER ON VARIOUS PRE–TRIAL MOTIONS

YOUNG, District Judge.

The four defendants in this action are charged with violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. sec. 1962(c), conspiracy to commit such violations, 18 U.S.C. sec. 1962(d), and seditious conspiracy, 18 U.S.C. sec. 2384. A variety of pre-trial motions have been heard by the Court. Certain of these motions warrant written opinions. These are set forth herein. The orders which do not, in the Court's view, require written exposition are set out in the Appendix following this opinion.

### I. *The Challenge to the Venire*

The defendants brought this motion to dismiss the jury pool, or alternatively, to reconstitute the pool through supplementation of the jury list on the grounds that the jury selection system employed by the Western Division of United States District Court for the District of Massachusetts (the "Western Division") violates their Fifth Amendment right to due process, their Sixth Amendment right to a fair trial, and the Jury Selection and Service Act of 1968, 28 U.S.C. secs. 1861 *et seq.* (the "Jury Selection Act").[1] Specifically, the defendants allege that the selection process results in a substantial underrepresentation of Blacks and Hispanics in the jury pool.

### A. Juror Selection in the Western Division.

The selection of jurors for the Western Division is governed by the Plan for Random Selection of Jurors adopted by the United States District Court for the District of Massachusetts in 1980 and modified in 1986. Under the present plan, the Western Division draws jurors from Berkshire, Franklin, Hampden and Hampshire counties.[2] Prior to the 1986 modification, the Western Division also drew jurors from certain cities and towns in Worcester County.

---

**1.** The Act provides in relevant part that "[i]t is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. sec. 1861. Further, "[t]he plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." *Id.* at sec. 1863(b)(2).

**2.** Although names are selected at random, the system is designed to ensure that each city or town is represented proportional to its number of registered voters. United States District Court for the District of Massachusetts Plan for Random Selection of Jurors (revised August 12, 1986) at 2–3.

The court randomly selects names from registered voter lists to establish an initial pool, termed the Master Jury Wheel. The Clerk selects, as necessary and at random, groups of potential jurors from the Master Jury Wheel. Each potential juror is sent a juror qualification questionnaire, which is reviewed by a judge to determine if that individual is qualified to serve. Those potential jurors deemed qualified, non-exempt,[3] and unexcused[4] form the Qualified Jury Wheel from which individuals will actually be called to serve on petit and grand juries.

### B. Alleged Underrepresentation in the 1984 Qualified Jury Wheel.

The defendants presented the Court with data from the 1984 Qualified Jury Wheel Pool. That pool consisted of 2369 persons of whom 46 (1.94%) were Black and 22 (0.93%) were Hispanic, for a total Black and Hispanic representation of 2.87%. The 1986 Commonwealth of Massachusetts figures, for the cities and towns of the five counties from which the Western Division's jurors were drawn in 1984, reveal that 5.77% of the total population is Black or Hispanic.[5] The government criticizes the defendants' statistics, first noting that this data is more than three years old. Moreover, the government argues, because the defendants studied the Qualified Jury Wheel rather than the Master Jury Wheel, any discrepancy may simply be the result of either a higher incidence of failure to return juror questionnaires or a higher incidence of legitimate disqualification among

Blacks and Hispanics, not the result of underrepresentative voter lists.

This Court is satisfied with the figures proffered by the defendants, as corrected,[6] for the purpose of its analysis. This Court has no evidence before it nor any reason to believe that the demographics of the voter registration lists in the Western Division have changed appreciably in this short period of time. Nor does this Court have any evidence or any reason to believe that any underrepresentation of Blacks or Hispanics, results from any failure on their part to return juror questionnaires or to be qualified by the screening judge.

### C. Analysis Under *Hafen*.

■ Although this Court might reach a different conclusion were this a matter of first impression, the First Circuit's decision in *United States v. Hafen*, 726 F.2d 21 (1st Cir.1984), *cert. denied*, 466 U.S. 962, 104 S.Ct. 2179, 80 L.Ed.2d 561 (1984)—a case involving Sixth Amendment and Jury Selection Act challenges to the Eastern Division's plan—is controlling. The *Hafen* court held first that a defendant who challenges jury composition must pass a three-part test:

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the communi-

---

3. Certain individuals are automatically exempted from jury duty, e.g., individuals on active service in the armed forces, members of the fire or police departments, and public officials. 28 U.S.C. sec. 1863(b)(6).

4. Upon their request, certain individuals may be excused from jury duty, e.g., persons over 70, attorneys, and clerics. United States District Court for the District of Massachusetts, Plan for Random Selection of Jurors (revised Aug. 12, 1986) at 7.

5. With respect to Worcester County, only data from the cities and towns from which the Western Division selected jurors in 1984 was used. Defendants supplied data for 1980 and 1986.

The latter data is used by this Court because it is closer in time to the 1984 Qualified Jury Wheel studied in this case.

The defendants assert in their papers that the percentage of Blacks and Hispanics in the relevant cities and towns of the five counties in 1986 was 6.1%. However, their own data reveals that the figure is actually 5.77%. The discrepancy is apparently due to an error in addition in Exhibit G of defendants' Memorandum of Law. The defendants there incorrectly totalled the number of Hispanics to be 36,025 when in fact the figure was 32,306. This discrepancy accounts for the difference between 6.1% and 5.77%.

6. *See supra* note 5.

ty; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Hafen*, 726 F.2d at 23 (quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 [1979]).

The defendants satisfy the first prong of the *Duren* test: Blacks are a distinctive group for the purpose of a jury composition challenge, *see Peters v. Kiff*, 407 U.S. 493, 498–99, 92 S.Ct. 2163, 2166, 33 L.Ed.2d 83 (1972); *Anaya v. Hansen*, 781 F.2d 1, 6 (1st Cir.1986), as are Hispanics, *see People v. Harris*, 36 Cal.3d 36, 201 Cal.Rptr. 782, 679 P.2d 433 (1984) (plurality opinion), *cert. denied*, 469 U.S. 965, 105 S.Ct. 365, 83 L.Ed.2d 301 (1984); *cf. Hernandez v. Texas*, 347 U.S. 475, 479–80, 74 S.Ct. 667, 671, 98 L.Ed. 866 (1954) (holding that Mexican–Americans are a distinct class for the purpose of a jury composition challenge brought under the Fourteenth Amendment equal protection clause). However, under *Hafen* the defendants founder on the second point. The defendant in *Hafen* alleged that the selection process employed by the Eastern Division resulted in the underrepresentation of Blacks. The First Circuit employed an absolute disparity test in which the percentage of individuals who identified themselves as Black on the juror qualification form (1.71%) was subtracted from the percentage of the population of the Eastern District aged 18 and over that was Black (3.73%). The court's calculation resulted in an absolute disparity of 2.02% (3.73%—1.71%), a disparity that the court found did not satisfy the defendant's burden of showing underrepresentation. *Hafen*, 726 F.2d at 23–24.

The absolute disparity revealed by the defendants' figures in the instant matter is not sufficiently dissimilar to distinguish their case. The absolute disparity in the figures from the 1984 Qualified Jury Wheel is 2.90% (5.77%—2.87%). Given that the court cited decisions in other circuits approving absolute disparities as high as 10%, *id.* at 23, this Court concludes that, under *Hafen*, the absolute disparities alleged by the defendants are insufficient to establish that Blacks and Hispanics are underrepresented in the venires from which jurors are selected in the Western Division.

However, as Judge Selya is fond of saying, "Death and taxes, arguably, may be certain; statistics, though often a valuable predictive aid, usually are not." *Reilly v. United States*, 863 F.2d 149, 167 (1st Cir. 1988); *Chang v. University of Rhode Island*, 554 F.Supp. 1203, 1206 (D.R.I.1983) (same).

The defendants assert that a comparative disparity analysis rather than an absolute disparity analysis is more appropriate here. This analysis would focus on the percentage difference between the proportion of Blacks and Hispanics in the general population (5.77%) and the shortfall in Black and Hispanic representation (5.77% − 2.87% = 2.90%), demonstrated formulaically as follows:

$$\frac{\text{group's proportion of population} - \text{group's proportion of jury pool}}{\text{group's proportion of population}} \times 100$$

In this case, the comparative disparity is

$$\frac{5.77\% - 2.87\%}{5.77\%} \times 100 = 50.3\%$$

There is much to commend this approach. What under an absolute disparity test appears to be a small disparity, 2.90%, is revealed to have a substantial impact on Black and Hispanic representation on juries in the Western Division. Especially in such cases as this one where the distinctive group is significant yet small,[7] only a com-

---

**7.** *Hafen* argued that in cases involving small distinct groups, comparative disparity analysis distorted the actual underrepresentation. By way of example, the court posited a case in which a population consisted of 500,000 whites and one black, noting that the comparative disparity would be 100% every time the one black resident was left off the wheel. 726 F.2d at 24. Of course, that case bears little relation to this one (or for that matter to the facts of *Hafen* itself) where the population in question is siza-

ble enough to expect to place approximately 137 (5.77% of 2369) of its members on the relevant jury wheel. In this case, distortion in fact is avoided only by rejecting an absolute disparity analysis which necessarily makes the underrepresentation of significant but small populations appear minor. For example, if no Blacks or Hispanics were ever placed in the Western Division Qualified Jury Wheel, the absolute disparity would be only 5.77%, well below some of the cases cited with apparent approval by the *Hafen*

parative disparity analysis will afford sufficient protection to defendants' right to be tried by a cross-section of the community. Here, the comparative disparity of 50.3% indicates that Black and Hispanic representation on juries is less than half of what their proportion of the population suggests it should be.

While it does not rise to the level of a constitutional or statutory violation, the Court considers the fact that there is a 50.3% comparative disparity especially troubling for two reasons. First, it substantially impacts the right of Blacks and Hispanics to participate fully in the public life of their communities through engagement in the direct democracy afforded by our jury system. Second, it substantially affects the composition of the cross-section of the community from which the jury is drawn. As the Supreme Court has written,

> When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented.

*Peters v. Kiff*, 407 U.S. 493, 503–04, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (1972).

Despite this Court's serious misgivings about denying the defendants' constitutional and statutory challenges to a system that underrepresents Blacks and Hispanics by more than 50%, this Court is bound to do so by *Hafen*.[8] Therein, the First Circuit let stand an identical plan that resulted in an even greater comparative disparity of 54.2%. *Id.* at 23. In light of the foregoing, the defendants' Motion to Dismiss the Jury Pool is denied.

### D. Supplementation of the Jury Pool.

■ The Court, having rejected the defendants' challenge to the entire jury pool, must turn to their motion in the alternative that membership in the Master Jury Wheel (presently limited to individuals randomly selected from the voter lists) be expanded and supplemented by jurors drawn from the street lists of each city and town within the Western Division.[9] Given the reservations expressed by this Court to proceeding with jury selection from the Master Jury Wheel for the Western Division of the United States District Court in light of the statistically-significant underrepresentation of Blacks and Hispanics thereon, the defendants might well have expected that the Court readily would have granted their motion to supplement the Master Jury Wheel.

court. *Id.* at 23. Comparatively, of course, the disparity would be 100%, reflecting more accurately the degree to which Blacks and Hispanics would be excluded from jury service.

**8.** Defendants seek to distinguish *Hafen* because in *Hafen* no due process claim was before the court. However, this Court finds no reason to analyze this case differently because a due process challenge has been brought. *See, e.g., United States v. Whitley*, 491 F.2d 1248 (8th Cir.) *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974) (applying absolute disparity analysis to a jury selection challenge asserting due process, Sixth Amendment and equal protection grounds.)

**9.** On September 19, 1988, the defendants renewed their motion to supplement the venire with individuals drawn from the so-called 'street lists' or jury lists of the Commonwealth of Massachusetts. This renewed motion was denied

for the same reasons as was the original motion. *See infra* Section I–D. The renewed motion further sought, in the alternative, to constitute the next panel of potential jurors with names drawn from the street lists or jury lists of the Commonwealth. This Court has no authority under the Jury Selection Act to substitute jurors drawn pursuant to a procedure at variance with the Jury Selection Act. That act provides, in relevant part, "[t]he plan shall prescribe some other source or sources of names *in addition to* voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." 28 U.S.C. sec. 1863(b)(2). It says nothing of substitution. "Although the statute does allow for supplementation of voter lists, the legislative history is clear that additional sources can only supplement and *not supplant* voter lists. *United States v. Brady*, 579 F.2d 1121, 1131 (9th Cir.1978) (emphasis added). The most the Court can do is supplement the Master Jury Wheel.

Still, the Court, in exercise of its discretion, denied the motion.

The reasons are not hard to fathom. While this Court must scrupulously insure the defendants' constitutional rights to a fair jury selection process, *Hafen* makes clear that use of the Master Jury Wheel in this case has not infringed those rights. Absent a showing that the voter lists do not represent a cross section of the community, supplementation of names is not constitutionally or statutorily required. *United States v. Maskeny*, 609 F.2d 183, 189–92 (5th Cir.1980), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *see also United States v. Coats*, 611 F.2d 37, 41 (4th Cir.1979) (and cases cited), *cert. denied*, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980). In fact, at least one court has held that supplemental sources shall be used *only* when voter lists deviate substantially from the makeup of the local community. *United States v. Brady*, 579 F.2d 1121, 1131 (9th Cir.1978) (emphasis added), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979). Given the foregoing, even if this Court has discretion to order supplementation of the jury wheel [10] where there is no statutory or constitutional violation, it still declines to do so. Economy and efficiency considerations counsel against it. "It is ... implicit ... that the cost of supplementation must be weighed against the benefits of so doing." *United States v. Facchiano*, 500 F.Supp. 896, 903 (S.D.Fla.1980).

Supplementation, when it occurs, must mean supplementation of the Master Jury Wheel itself, not some ad hoc supplementation process to add jurors to a special venire such as was summoned for particular service in this lengthy case. As the special venire was properly chosen by a scrupulously random selection of potential jurors from the Master Jury Wheel, supplementa-tion at the trial level would necessarily and inevitably skew that random selection. Attempting to realign such a skew raises a host of complicated questions. How many jurors should be added by the supplementation? From what communities should they be drawn, and in what proportion? Should the pool of potential jurors be supplemented so that it would be half again as large as the original venire?—twice as large?—three times as large?

Moreover, supplementation of a special venire—even an exceptionally large one such as the several hundred people called for potential service in this lengthy case—would result in underrepresentation or overrepresentation of the most rural areas of Western Massachusetts since a relatively small proportional supplementation would call for fractional jurors from certain of the smallest Massachusetts towns. If these fractional jurors were excluded, such rural areas would be underrepresented. If included in such a manner as to draw a juror wherever a fractional juror might be required, such areas would be overrepresented.

Certain of the same questions, of course, occur with respect to an order to supplement the Master Jury Wheel itself. That is, by what proportion is the Master Jury Wheel to be supplemented? If supplementation is to occur throughout the Western Division, drawing from each city and town in proportion to its population from a uniform data base such as the jury lists of the Commonwealth of Massachusetts, daunting administrative problems are presented. It would take weeks if not months to reconstitute the Master Jury Wheel itself due to the necessity of folding the supplemental jurors into the jurors presently listed in the Master Jury Wheel while taking care that any particular juror's name not appear

---

10. *Cf. Fay v. New York*, 332 U.S. 261, 287, 67 S.Ct. 1613, 1627, 91 L.Ed. 2043 (1947) (noting the ability of the Supreme Court to "exert a supervisory power [over the selection of jurors in federal courts] ... to reflect our notions of good policy"); *United States v. Whitley*, 491 F.2d 1248, 1249 n. 1 (8th Cir.), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974) (noting the supervisory powers of [circuit] courts to "impose [their] notions of good policy over and above any constitutional requirements"). In light of these decisions, query whether a single judge of a multi-judge district court has individual 'supervisory' powers to order a significant modification in the plan for selecting jurors without a showing of a constitutional or statutory violation?

twice. Due to these considerations, the Court concludes that, although it clearly has the power to order supplementation of the Master Jury Wheel if there is a statutory or constitutional violation and may, indeed, have some supervisory authority in this area,[11] it would seem improvident to exercise such authority unless failure to act will result in some cognizable prejudice to the defendants.

The defendants here point to no such possible prejudice as has been ruled cognizable at law, and this Court finds none. All that is required is a fair selection process and, in this circuit, *Hafen* makes clear that the selection process followed here passes constitutional muster. What's more, this Court has gone to extraordinary lengths to ensure a scrupulously fair jury, with respect to both the government and each of the defendants. Each juror has completed a complex thirty-nine page questionnaire providing individual factual data concerning the juror and his or her attitudes. In addition, the Court has engaged in individual voir dire of hundreds of jurors, whose individual interviews frequently lasted in excess of an hour. The government and each defendant has been granted preemptory challenges in addition to those required by rule. Jury selection has lasted sixty eight trial days.[12] This Court is satisfied that these measures ensure a fair jury for the trial of this case, that there is no constitutional or statutory violation mandating supplementation, that no prejudice has inured to the defendants from the manner from which the jury was selected herein, and that the additional expense and delay attendant upon the supplementation of the Master Jury Wheel warranted this Court to exercise its discretion to refuse to order supplementation in this case.

Although this Court rules that no constitutional or statutory violation has been mounted in this case and that economy and efficiency counsel against supplementing the Master Jury Wheel at this juncture, analysis can hardly end here. The simple fact is that, although apparently constitutionally permissible, Black and Hispanic representation on juries in the Western Division of the United States District Court for the District of Massachusetts is less than half of what their proportion of the population suggests it should be. A procedure that permits such a disparity when better methods of selecting juries exist ought be—and is—entirely unacceptable to the judges of this court.

Numerous judicial districts have successfully supplemented their jury pool on a district-wide basis. It is reported to the judges of this court that the Jury Commissioner for the Commonwealth of Massachusetts—a state which has one of the most progressive jury selection systems in the United States—will provide the Commonwealth's jury lists to the United States District Court for the District of Massachusetts at no charge. This Court emphatically endorses the prescient remarks of the Hon. Michael Ponser, United States Magistrate for the Western Division of the United States District Court for the District of Massachusetts that "[I]n the exercise of its supervisory power, the district court should consider supplementation of voter lists in order to reduce or, one hopes, eliminate [the] discrepancy [between the proportion of minorities on juries and the proportion of minorities in the population]." *United States v. Scibelli*, No. 85–0399–F, slip op. at 7 (D.Mass. July 28, 1987). For these reasons, among others, the judges of this court are presently engaged in a collegial process [13] leading to a district-wide supple-

---

11. *See supra* note 10.

12. The aggregate reimbursement of counsel appointed under the Criminal Justice Act, 18 U.S. C. sec. 3006A, to represent these indigent defendants has exceeded $800,000 in the pretrial jury selection phase of these proceedings alone. The collective knowledge of Court and counsel reveals only one jury empanelment taking longer than that employed by the Court in this case.

It is reported that the empanelment of a jury in a Connecticut state court to try Bobby Seale on various charges lasted for over a year and resulted in a conclusion that no fair jury could be selected from that area.

13. The Jury Selection Act provides that "[t]he district court may modify a plan at any time." 28 U.S.C. sec. 1863.

mentation of the Master Jury Wheel so there can be no question of disproportional representation of minorities as jurors within this judicial district.

## II. *The Motion for an Evidentiary Hearing on Certain Suppression Issues*

The defendants have moved this Court for an evidentiary hearing pursuant to Fed. R.Crim.P. 12(b)(3) and 41(e) to determine if cash seized at two locations—a 1979 GMC van and a residence at 4248 West 22nd Street, Cleveland, Ohio—and ski masks seized at two locations—the Cleveland residence and a house at 1903 State Route 225, Deerfield, Ohio—should be suppressed and returned. This Court originally suppressed the items in question because the warrant pursuant to which the van and the residences were searched did not authorize the seizure of cash or clothing. *See* Pretrial Hearing Transcript of January 13, 1988 at 17. Upon the submission of the seizing agents' affidavits, this Court held that the cash was admissible because it was lawfully seized pursuant to the plain view doctrine as enunciated in *Arizona v. Hicks*, 480 U.S. 321, 326–27, 107 S.Ct. 1149, 1153–54, 94 L.Ed.2d 347 (1987) and *Coolidge v. New Hampshire*, 403 U.S. 443, 465–71, 91 S.Ct. 2022, 2037–41, 29 L.Ed.2d 564 (1971) (plurality opinion). *United States v. Levasseur*, 699 F.Supp. 965, 983–86 (D.Mass. 1988). Until now, the Court's ruling on the ski masks has stood because, until recently, the government had not submitted affidavits concerning the ski masks' seizure. This memorandum explains the Court's decision not to suppress the cash, announces the Court's decision not to suppress the ski masks, and explicates the Court's decision upon reconsideration not to grant the defendants an evidentiary hearing concerning these matters.

Fed.R.Crim.P. 41(e) directs courts to conduct hearings to "receive evidence on any issue of fact necessary to the decision of the motion." The issue for the Court thus resolves itself into a consideration of what issues of fact are necessary to the decision of this motion and thus require an evidentiary hearing.

It is now well established that the seizure of items not expressly authorized by a warrant can be justified if the item is inadvertently found in plain view by an officer lawfully on the premises, *Coolidge*, 403 U.S. at 465–71, 91 S.Ct. at 2037–41 (plurality opinion); *United States v. Johnston*, 784 F.2d 416, 419 (1st Cir.1986), and the officer has probable cause to believe that the item is, among other things, stolen, *see Hicks*, 480 U.S. at 326–27, 107 S.Ct. at 1153–54. The defendants do not dispute that the FBI agents who seized the cash and ski masks were lawfully on the premises searched or that the discovery of the cash and ski masks was inadvertent. Rather, the defendants seem to question whether the cash and ski masks were found in plain view or whether the cash and ski masks, as they were found, provided the agents with the requisite probable cause to believe that they were the fruits or instrumentalities of crime.

The defendants insist that the suppression issue can only be resolved by an evidentiary hearing. However, "[e]videntiary hearings on motions under Fed.R.Crim.P. 41(e) are not granted as a matter of course...." *United States v. Migely*, 596 F.2d 511, 513 (1st Cir.1979). "The factual allegations must be such that, if proved, they would require the grant of relief and must be more than 'general or conclusory or based upon suspicion and conjecture.'" *Id.* (citation omitted). Courts have recognized that inherent in the necessarily imprecise guidance of the foregoing language is a recognition that "'the district court is properly left with a certain amount of discretion in this regard.'" *United States v. Harrelson*, 705 F.2d 733, 737 (5th Cir.1983) (quoting *United States v. Losing*, 539 F.2d 1174, 1178 [8th Cir.1976]); *see also United States v. Walczak*, 783 F.2d 852, 857 (9th Cir.1986).

Had the defendants cited *Migely*, they might have seized on language therein that, on its face, suggests that a hearing is necessary. The First Circuit there stated that, to win an evidentiary hearing, a defendant had to make "a sufficient showing that a warrantless search has occurred." 596 F.2d at 513. This the defendant in

*Migely* failed to do. Although he argued that certain circumstantial evidence raised an inference that a mail search in violation of his Fourth Amendment rights had occurred and thus that a hearing was required, the court found the defendant's theory "no more than conjecture and speculation," and refused to grant a hearing. *Id.* at 514.

Here, of course, there is no dispute that a warrantless seizure in fact took place. The only issue is whether the seizure falls within the plain view exception to the warrant requirement. Because *Migely* was concerned only with whether to grant an evidentiary hearing to consider if a warrantless seizure had actually taken place, not with whether any exception to the warrant requirement might save the seizure, this Court does not interpret the above language as mandating an evidentiary hearing. *Migely* merely established the criteria to be employed in a type of case different from the instant one.

Accordingly, this Court must further consider the issue, extrapolating from *Migely* guidance for its endeavor. Of central importance is *Migely's* admonition that "general and conclusory" allegations are insufficient. The contents of the defendants' moving papers, however, do not even rise to the level of "general and conclusory" allegations. Indeed, the defendants make no allegations at all and merely call on the government to justify its seizure at an evidentiary hearing.

■ The question then becomes, is the government's showing, unopposed factually by the defendants, sufficient to permit the Court to admit the cash and the ski masks and deny the defendants' motion for an evidentiary hearing? In answering this question, it is first necessary to review what that showing is. The government has come forward with affidavits from the FBI agents who seized the cash and ski masks, which affidavits purport to satisfy the requirements of the plain view doctrine. With respect to the cash, the affidavits note that all the cash seized was found in plain view—e.g., in various containers of sufficient size to have hidden items which the warrant specifically authorized to be seized. *See Levasseur,* 699 F.Supp. at 983–84. The affidavits also establish that, given the agents' experience, their exposure to each cache of cash provided them with probable cause of criminality. *Id.* at 984–86. Some money bore telltale red stains caused by exploding red dye packs.[14] Other large amounts of cash were found in unusual locations such as the nearly $5,400.00 discovered in a briefcase. *Id.* at 985. Given that the defendants were suspected bank robbers, this evidence was sufficient to provide probable cause. *Cf. United States v. Golay,* 502 F.2d 182, 185–86 (8th Cir.1974) (holding that police officers, who while searching for diamonds discovered a briefcase containing $9,000.00 in cash arranged in bundles held by bank wrappers together with a pistol and a quantity of marijuana, had lawfully seized this evidence pursuant to the plain view doctrine). In this manner, with respect to the cash the Court rules that the government has satisfied the burden of proof it must bear to gain the admission of evidence not seized pursuant to a warrant. *See, e.g., United States v. Longmire,* 761 F.2d 411, 417 (7th Cir.1985); *United States v. Berick,* 710 F.2d 1035, 1037 (5th Cir.1983); IV W. LaFave, *Search and Seizure,* sec. 11.-2(b), at 218 (2nd ed. 1987).[15]

■ The affidavits submitted concerning the ski masks are more troublesome. The affidavits sufficiently establish that the experience of the searching agents with re-

---

14. The packs, which resemble stacks of bills, are designed to be handed over to bank robbers along with packets of real cash. They then explode at a later time, staining the bills and thereby marking them as stolen. *Levasseur,* 699 F.Supp. at 984.

15. Although the Court's analogy to summary judgment, *see infra* at 1168 alone justifies the use of affidavits, the Supreme Court has held that, because "the process due at a suppression hearing may be less demanding and elaborate than the protections accorded the defendant at the trial itself," "[a]t a suppression hearing the court may rely on hearsay and other evidence ... not admissible at trial." *United States v. Raddatz,* 447 U.S. 667, 679, 100 S.Ct. 2406, 2414, 65 L.Ed.2d 424 (1980).

spect to bank robberies, specifically their knowledge that bank robbers often use ski masks to obscure their features and voices, made the discovery of ski masks, some of which had the eyes and mouths sewn partially shut, sufficient to establish probable cause of criminality. However, the affidavits are less explicit as to whether the masks were found in plain view. Indeed, on their face, the affidavits make no mention of where or how the masks were discovered except to note in what rooms of the two residences they were located.

The Court is troubled by the rather threadbare nature of the submitted affidavits on this point. If the prosecution expects to live by the sword of the summary judgment model outlined below,[16] it should rest assured that it can also perish by that sword. The government is spared here from an untimely end with respect to this issue only because of the unique context in which this Court reads these affidavits. Over the course of the pretrial proceedings in this case, the Court has conducted a *Franks* hearing with respect to the search warrants underlying the searches in question and a suppression hearing with respect to statements made immediately after the arrest of two of the defendants at the 4248 West 22nd Street residence which precipitated the search of that residence. As noted above, the Court has also received affidavits from the searching agents pertaining to the cash seized. Based on that information as well as on the affidavits before the Court with respect to the masks, and given the extraordinarily broad nature of this search warrant,[17] this Court can fairly draw the inference that these masks were found in plain view.[18] Therefore, these affidavits are—barely—sufficient.

The government's satisfaction of this burden through affidavits, of course, does not settle the matter. Rather, in determining whether a warrant was necessary, this Court made it clear to all parties

that it would also examine any affidavits put forward by the defendants, much as in a motion for summary judgment, to determine if an issue of material fact exists which would warrant a hearing. Because the defendants have failed to offer affidavits or even to make factual assertions in their moving papers, they must fail unless a persuasive argument exists why the determination to grant an evidentiary hearing should not be approached like a summary judgment motion. This Court can conceive of no such argument. If there is no issue of fact in dispute, no hearing is necessary and the Court can apply the law to the unchallenged facts. If facts are in dispute, an affidavit is the appropriate vehicle by which so to apprise the Court.

One might argue that the constitutional rights protected by the suppression doctrine are of such overwhelming importance that a full blown hearing is requisite in these circumstances. The law has clearly rejected this view. *See, e.g., Migely*, 596 F.2d at 513. Indeed, the Supreme Court has recognized that suppression hearings, at which "the interests at stake ... are of lesser magnitude than those in the criminal trial itself," *Raddatz*, 447 U.S. at 679, 100 S.Ct. at 2414, require a lower standard of proof than the underlying criminal trial, *viz.*, preponderance of the evidence as opposed to beyond a reasonable doubt. *United States v. Matlock*, 415 U.S. 164, 178 n. 14, 94 S.Ct. 988, 996 n. 14, 39 L.Ed.2d 242 (1974) (holding that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"); *Lego v. Twomey*, 404 U.S. 477, 488–89, 92 S.Ct. 619, 626–27, 30 L.Ed.2d 618 (1972) (same). Indeed, the Supreme Court has been content with this more relaxed standard, even though it has explicitly recognized that "the resolution of a suppression motion can and often does determine the outcome of the [underlying criminal] case...." *Rad-*

---

**16.** *See infra* at 1168.

**17.** As noted below, the warrant permitted the searching agents access to virtually every area and container in the residences in question.

**18.** Indeed, over the entire time this Court has been engaged in pretrial proceedings, no allegation has been made that the agents searched any container or any area of the residences or vehicles that they were not authorized to search.

*datz,* 447 U.S. at 677–78, 100 S.Ct. at 2413. Moreover, other actions that protect the identical rights in question here—for example, *Bivens* and Section 1983 actions brought to remedy Fourth Amendment violations—are, of course, civil actions which may be resolved by summary judgment motions without a trial or indeed any type of evidentiary proceeding.

Another arguable reason for rejecting the summary judgment model would be that the defendants are somehow disabled from providing the type of affidavits necessary to trigger an evidentiary hearing. Indeed, the defendants conclusorily claim this is the case, although they fail to explain why this is so. Were this so, an evidentiary hearing would be required without question. This court, however, cannot conceive in what manner the defendants are so disabled. The example of the $4,198.00 found inside a brown paper bag inside a briefcase in the dining room of the 4248 West 22nd Street residence illuminates the point. A variety of facts alleged in a duly submitted affidavit would raise a genuine issue of material fact as to the government's plain view theory. The defendants could claim they had no money in the house, that they had this amount of money but that they did not keep it in a brief case in the dining room, or that the bills that they kept in the briefcase did not have red dye stains on their edges. These facts presumably are all within the knowledge of the defendants, yet none have been presented to the Court, by affidavit or otherwise, nor has any reason been given why such production is impossible.[19]

One might further argue that the government, especially because it has the burden of proof in a suppression hearing where no warrant supports the search, should be put to its proof at an evidentiary hearing to establish that the evidence was lawfully seized. This may well be the case under a different set of facts. One can imagine an extremely limited search warrant and a defendant who simply cannot recall where a particular item of evidence was located in the residence before an unexpected police search. In such a case a defendant might well be incapable of supplying the requisite affidavit and thus of preliminarily establishing the existence of a genuine issue of material fact to the court's satisfaction. In such a case, an evidentiary hearing might well be necessary.

Such is not this case. Here, the searching agents were armed with arguably the broadest warrant imaginable—a warrant which, by its terms, allowed the agents access to virtually every nook and cranny of the van and the residences. For example, the warrant permitted the seizure of any object with fingerprints as well as the seizure of bomb parts, including the tiny screws necessary to a bomb's ignition system. *See* Search Warrant, Attachment A, para. 1. Given the scope of the warrant, the cash and ski masks in question would have to have been in an extraordinary location—one that it is inconceivable the defendants could have forgotten—for the agents to have found them while searching a container or area of the apartment outside the scope of the warrant.[20]

---

**19.** This Court would be loath to force the defendants to choose between vindicating their Fourth Amendment rights and exercising their Fifth Amendment right against self-incrimination. Such an issue is not raised herein, however, because the Supreme Court has made it clear that a defendant's testimony at a suppression hearing is not admissible at trial. *Simmons v. United States,* 390 U.S. 377, 389–90, 88 S.Ct. 967, 973–74, 19 L.Ed.2d 1247 (1968). One commentator has opined, and the Court agrees, that the *Simmons* doctrine should be extended to affidavits offered in connection with a suppression hearing. IV W. LaFave, *supra,* sec. 11.2(a), at 217.

**20.** The Court notes that the First Circuit has held that the subjective intent of a searching agent is irrelevant to the issue of suppression. *See United States v. Trullo,* 790 F.2d 205 (1st Cir.1986) (holding that the test for whether a container was properly opened during an automobile inventory search is an objective one— could the container hold valuables that should properly be inventoried?—not a subjective one, i.e., did the searching officer expect to find in the container illegal drugs not properly the object of his search?) Thus, this Court is merely concerned with whether the warrant objectively supported the search of any of the areas or containers in which the cash and ski masks were found, not whether the searching agent subjectively had in mind a particular evidentia-

The Court therefore DENIES the defendants' request for an evidentiary hearing. Although no case directly on point has been cited to or found by the Court, two cases support this decision by analogy. In *Miller v. United States*, 564 F.2d 103 (1st Cir. 1977), the plaintiff was denied a hearing on his federal habeas corpus motion to vacate his sentence based on a claim of ineffective assistance of counsel. The court ruled that the district court may dispose of such a matter without a hearing if a preliminary assessment of the motion's merits on an expanded record, including affidavits, indicates that a hearing is unnecessary to the matter's proper disposition. *Id.* at 106. In *United States v. Gambale*, 610 F.Supp. 1515 (D.Mass.1985), the court considered the defendants' request for a hearing to determine whether the government, in conducting electronic surveillance, had failed to minimize the interception of nonpertinent conversations. The court denied the defendants' motion for an evidentiary hearing on the ground that the defendants had failed to produce evidence that a substantial number of non-pertinent conversations had been intercepted unreasonably. *Id.* at 1529–32. Similar to the instant matter, the defendants' failure to put into question a fact of central importance to their motion resulted in the denial of an evidentiary hearing. *See also Harrelson*, 705 F.2d at 737–38 (affirming the denial of the defendant's request for an evidentiary hearing concerning a motion to suppress certain statements based on a claim of attorney-client privilege where the defendant failed to assert facts to support a finding of the existence of an attorney-client relationship).

The defendants might have cited, in their support, *United States v. Jones*, 652 F.Supp. 1561 (S.D.N.Y.1986). There, the court considered whether to grant an evidentiary hearing to determine whether evidence would be admissible pursuant to the plain view doctrine. The court ruled that a hearing was necessary first to decide whether the discovery of certain evidence had been inadvertent. *Id.* at 1577. The inquiry in this respect centered on whether the police knew that they would find the evidence in the premises searched, yet failed to include the evidence in the warrant application. *Id.* The court held that the government was required to come forward with proof that the items it seeks to introduce under the plain view doctrine were obtained in good faith, and that the defendant was entitled to cross-examine any witnesses the government might offer. *Id.* The hearing was also necessary to determine whether the incriminating nature of the evidence seized in plain view was immediately apparent. *Id.* at 1577–78.

*Jones* is easily distinguished from the instant case. With respect to inadvertence, as noted above, the defendants have never alleged that the government knew that the cash would be found on the premises.[21] With respect to the evidence's incriminating appearance, the court in *Jones* was troubled that there was "simply no evidence in the record whether ... the incriminating nature of the 'plain view' items was 'immediately apparent'" and noted that it was not immediately apparent to it that certain items of the evidence, e.g., cufflinks, were incriminating. *Id.* at 1578. Here, of course, the government has made such a convincing showing through affidavits that the incriminating nature of the cash and ski masks is immediately apparent to this Court.

Determining whether a hearing is required depends upon the particular facts of each case confronting a court. *Harrelson*, 705 F.2d at 737; *Matter of 949 Erie Street, Racine, Wisconsin*, 645 F.Supp. 55, 57 (E.D.Wis.1986). As in many areas of law, to arrive at its determination the court must balance competing policy concerns. As stated above, while the court must be a vigilant sentinel of individual rights, once those rights are so secured, as this Court is convinced they are secured by the summa-

---

ry item listed in the warrant when he or she searched these areas or containers.

**21.** The moving party bears the burden of establishing that a material fact is in dispute. *Matter*

*of Searches and Seizures Conducted, Etc.,* 665 F.2d 775, 776 (7th Cir.1981); *Matter of 949 Erie Street, Racine, Wisconsin,* 645 F.Supp. 55, 57 (E.D.Wis.1986).

ry judgment mechanism, efficiency considerations may properly be entertained.[22] Evidentiary hearings are not fishing expeditions, nor were meant to be. *See De Vincent v. United States*, 632 F.2d 145, 146 (1st Cir.1980) (holding that a federal habeas petitioner was not entitled to an evidentiary hearing to determine whether all the members of the grand jury that indicted him had voted on the actual terms of his indictment because his supporting affidavit lacked any proof of his allegation). The defendants' request for a hearing is based on mere speculation that something improper may have occurred during the plain view seizure of the cash in question. Mere speculation does not warrant an evidentiary hearing.

### III. *Motion of the Government for Reconsideration, Particularized Rulings, and Clarification*

The government has filed a motion with respect to certain rulings made on January 13, 1988 (the "January 13 order") in which the Court ruled that paragraph sixteen of the Ohio search warrants is overbroad and material seized solely pursuant to that paragraph must be suppressed. Transcript of January 13, 1988 ("Transcript") at 16. The government moves for (1) reconsideration by the Court of its ruling that paragraph sixteen is overbroad, (2) alternatively, pretrial rulings by the Court as to whether particular items of evidence are suppressed by the January 13 order, and (3) clarification of the January 13 order with respect to the suppression of items a searching officer might reasonably believe bore fingerprints.

### A. Paragraph Sixteen Reconsideration.

█ The January 13 order was entered from the bench and reads, in relevant part, as follows:

Paragraph 16 of the warrant which reads books, documents, or other papers [ ]tending to show motive or intent is too broad to allow a searching officer to understand what it is he's supposed to look for even when it is read in light of the affidavit ... which accompanied the warrant. And therefore, matters which were seized solely because of that paragraph must be suppressed. That does not mean that the notebooks must be suppressed ... under that ruling because it seems to me that the notebooks from examination, even if you could not understand the alleged code, showed the associations of people in such sufficient detail that any reasonable searching officer would be led to them and would seize them. It also does not mean that books like political tracts could not be seized if it were reasonably thought that they might have fingerprints. A searching officer would logically look at books and seize them if [he] thought that they had fingerprints. And the line I'm going to follow is, if the book has fingerprints, it comes to have fingerprints, then fine; but if it's just a book that's seized, some book that's there ..., those are suppressed.

Transcript at 16–17.

The government asserts that paragraph sixteen of the search warrant, read in conjunction with the remaining paragraphs of the warrant and the warrant affidavit, satisfies the particularity requirement of the Fourth Amendment. After thorough reconsideration, the Court adheres to the January 13 order.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to

---

**22.** *Cf. Raddatz,* 447 U.S. at 677, 100 S.Ct. at 2413 (holding that in deciding whether due process has been satisfied with respect to a suppression motion the court must consider these factors: "the private interests implicated; ... the risk of an erroneous determination by reason of the process accorded and the probable value of added procedural safeguards; and ... the public interest and administrative burdens, including

costs that the additional procedures would involve"). The Court notes that the defendants' interest in the suppression of evidence is "of lesser magnitude than [their interest] in the criminal trial itself," *id.* at 679, 100 S.Ct. at 2414, and little would be gained and much public expense generated by a hearing founded on a mere chimera of speculation.

be seized." U.S. Const. amend. IV. The purpose of the particularity requirement is not to prevent governmental intrusion *per se,* but rather to eliminate "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed. 2d 564 (1971). Moreover, as to the property to be seized, "nothing is [to be] left to the discretion of the officer executing the warrant." *United States v. Fuccillo,* 808 F.2d 173, 175 (1st Cir.1987) (quoting *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 [1965]), *cert. denied,* 482 U.S. 905, 107 S.Ct. 2481, 96 L.Ed.2d 374 (1987); *see also Marron v. United States,* 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927).

Even so, general descriptions in warrants have not always been found constitutionally infirm. In special circumstances, where substantial evidence exists to support the belief that a large class of seizable material is located on the premises to be searched and where in practical terms the items to be seized cannot precisely be described, generic descriptions may be permissible. *Montilla Records of Puerto Rico, Inc. v. Morales,* 575 F.2d 324, 326 (1st Cir.1978). The Fourth Amendment, however, will render such generic descriptions subject to scrutiny for reasonableness. In this regard, the First Circuit has required the search warrant, as nearly as possible, to distinguish the material that should be seized from the rest of an individual's possessions, or at least to provide the executing agents with criteria for so distinguishing. *Fuccillo,* 808 F.2d at 176; *United States v. Klein,* 565 F.2d 183 (1st Cir.1977). In *Klein,* the First Circuit first suggested a two-pronged test to guide the inquiry as to whether Fourth Amendment principles

have been satisfied.[23] First, the evidence presented to the issuing magistrate must establish that a large collection of seizable material exists on the premises to be searched, and, second, the warrant or accompanying incorporated affidavit must explain the method by which material to be seized may be differentiated from the rest of an individual's personal possessions. 565 F.2d at 187–88.

Taken together, under even the most liberal reading of the warrant and affidavit here, paragraph sixteen fails the second prong of the *Klein* test—a failure made abundantly clear by the manner in which the officers executed the warrant.[24]

Accordingly, for the reasons set out in the Court's *ore tenus* decision of January 13, 1988 and further explicated in the Court's Memorandum and Order of March 14, 1988 ("March 14 Memorandum"), items seized pursuant to paragraph sixteen of the search warrant must be suppressed unless they fit under another permissible category in the warrant. *See* 699 F.Supp. at 981–83. Memorandum at 34–37.

**B. Rulings on the Suppression of Particular Items Seized.**

 The invalidity of one provision in a search warrant does not, of course, require blanket suppression of all items seized pursuant to the warrant. *United States v. Riggs,* 690 F.2d 298 (1st Cir.1982). The exclusionary rule is a long-standing—even venerable—rule of evidence, *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), justifiable in theory as a doctrine essential to the protection of each citizen's right to privacy, *e.g., Mapp v. Ohio,* 367 U.S. 643, 656, 81 S.Ct. 1684, 1692, 6 L.Ed.2d 1081 (1961), as a prophylac-

**23.** History reveals, the Supreme Court assures, that the underlying protections the framers of the Bill of Rights sought to ensure when fashioning the Fourth Amendment requirement of particularity in search warrants, considered together with the First and the Fifth Amendments, were not only privacy and protection against self-incrimination but protections respecting individual conscience and human dignity and freedom of expression as well. *Stanford v. Texas,* 379 U.S. at 485, 85 S.Ct. at 511. Accordingly, "the constitutional requirement that warrants must particularly describe the 'things to be seized' is to be accorded the most scrupulous exactitude when the 'things' are books, and the basis for their seizure is the ideas which they contain." *Id.* (citations omitted); *see also Zurcher v. Stanford Daily,* 436 U.S. 547, 564, 98 S.Ct. 1970, 1984, 56 L.Ed.2d 525 (1978).

**24.** It is undisputed that the searching officers here seized all manner of writings indiscriminately.

tic against compromising the integrity of the courts, *e.g., Dunaway v. New York,* 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979), or as a prospective deterrent to Fourth Amendment violations that may occur through police misconduct, *e.g., Stone v. Powell,* 428 U.S. 465, 482–86, 96 S.Ct. 3037, 3046–49, 49 L.Ed.2d 1067 (1976). Recent judicial treatment has inclined toward the last of these justifications. *See United States v. Leon,* 468 U.S. 897, 916, 104 S.Ct. 3405, 3417, 82 L.Ed.2d 677 (1984). The rule is directed toward executing officers, not issuing magistrates, *id.,* and if the warrant was properly issued on probable cause and it is not so overbroad as to taint all evidence seized thereunder, the proper course of action calls for redaction of the portions of the warrant that are invalid for generality, not blanket suppression. *See Riggs,* 690 F.2d at 300; *United States v. Christine,* 687 F.2d 749, 754 (3d Cir.1982). The First Circuit has recognized this explicitly:

> [I]t would be harsh medicine indeed if a warrant which was issued on probable cause and which did particularly describe certain items were to be invalidated in toto merely because the affiant and magistrate erred in seeking and permitting a search for other items as well. . . .

*Riggs,* 690 F.2d at 300 (quoting 2 W. LaFave, *Search and Seizure* sec. 4.6[f], at 111–12 [1978]). Therefore, if items seized, ostensibly pursuant to paragraph sixteen, may permissibly have been seized pursuant to another paragraph of the warrant, they need not be suppressed.

The government has asked for pretrial rulings as to whether twenty-four groups of items seized purportedly pursuant to paragraph sixteen are suppressed pursuant to the January 13 order. These groups have been listed as proposed exhibits and assigned a number. Of the twenty-four, the Court rules that twenty-three proposed groups were seized permissibly pursuant to one of the other paragraphs in the warrant and the bulk of the remaining group was as well.[25]

■ The only item on which the government seeks a ruling which is suppressed pursuant to the January 13 order is one of the documents which were found in a manila folder, containing fifteen separate documents, collectively listed in the tentative exhibit list as "exhibit 954.44." *See* Motion of the United States with Respect to This Court's Order of January 13, 1988 Regarding Paragraph Sixteen of the Search Warrants ("Government Motion") at 33 and Appendix at tab 13. Although all the documents in this manila folder need not be suppressed, the pamphlet entitled "100 Ways to Disappear and Live Free" must be.

The government concedes that the pamphlet bears no fingerprints of any value to its case. Government Motion at 3. Therefore, as is discussed below, although the seizing officer may reasonably have believed that the document might bear fingerprints or palm prints, it may not be admitted unless it could have been seized pursuant to another paragraph of the warrant.

---

**25.** The numbers of the groups for which the government seeks pretrial suppression rulings, together with the warrant paragraph under which each could permissibly have been seized, are as follows:

(1) 511.028—(paragraphs 5 and 11);
(2) 511.063—(paragraphs 5 and 11);
(3) 511.092—(paragraphs 5 and 11);
(4) 511.93—(paragraphs 5 and 11);
(5) 511.129—(paragraphs 5, 11 and 17);
(6) 511.130—(paragraphs 5, 11 and 12);
(7) 511.131—(paragraph 11);
(8) 511.135—(paragraph 11);
(9) 511.139—(paragraphs 5, 11 and 17);
(10) 511.140—(paragraphs 3, 11 and 17);
(11) 514.08—(paragraphs 5 and 11);
(12) 548.03—(paragraph 11);
(13) 617.31—(paragraphs 5 and 11);
(14) 617.33—(paragraph 11);
(15) 619.49—(paragraph 11);
(16) 623.43—(paragraph 11);
(17) 623.45—(paragraph 11);
(18) 623.47—(paragraphs 5 and 11);
(19) 625.03—(paragraphs 5 and 11);
(20) 625.19—(paragraph 11);
(21) 625.20—(paragraph 11);
(22) 625.21—(paragraph 11);
(23) 954.42—(paragraph 11);
(24) 954.44—(paragraph 11).
With respect to group 24, one item could not have been permissibly seized pursuant to any paragraph, and has therefore been suppressed. *See infra* at 1173–1174.

As the document does not pertain to making, placing, or triggering bombs, nor to the acquisition, possession, and utilization of firearms and ammunition, it was not seized permissibly under paragraphs 3 or 5. *See* Search Warrant, Attachment A, paras. 3, 5. Nor can the document be said to tend *to show association with other co-conspirators. Id.*, para. 11. The mere fact of its presence on the premises to be searched does not tend to show association with anyone in particular because nothing in the document ties any one alleged co-conspirator to another. The pamphlet could only have been seized under paragraph sixteen as a document that tends to show intent, for example with respect to suspected violations of the federal law prohibiting unlawful flight to avoid prosecution. *See* 18 U.S.C. sec. 1073. There is no need for an evidentiary hearing, therefore, which would include testimony from officers participating in the search on this matter. What controls here is whether an executing officer had authority in fact to seize; an inquiry into what the officer's subjective intentions may have been in seizing is unnecessary. *Cf. Illinois v. Lafayette*, 462 U.S. 640, 646, 103 S.Ct. 2605, 2609, 77 L.Ed. 2d 65 (1983) ("It is immaterial whether the police actually fear any particular package or container; the need to protect against such risks [so as to justify an inventory search] arises independently of a particular officer's subjective concerns.") The test is one of objective reasonableness, not subjective state of mind. *United States v. Trullo*, 790 F.2d 205 (1st Cir.1986); *see supra* at note 20. The document could not permissibly have been seized under any provision of the warrant and must be suppressed.

### C. Clarification of the Order with Respect to Fingerprints.

 The government seeks further clarification of the January 13 order, and the subsequent March 14 Memorandum. The implications of that order, as it relates to fingerprints, are as follows. Items seized pursuant to the search warrants, the content of which items does not satisfy the particularity requirements of any paragraph except paragraph seven authorizing the seizure of fingerprints and palm prints, will be suppressed unless the item in question in fact bears fingerprints or palm prints. In such a case, if the item—say a book—was permissibly seized *only* for the purpose of gathering fingerprint or palm print evidence, not for the book's content, and no such evidence is ultimately found, the item is suppressed. If such evidence is found, the government may introduce the fingerprint or palm print evidence at trial but it may not introduce the book for its content. Unless the content of the document may have been seized pursuant to some other viable paragraph of the warrant,[26] that evidence is suppressed.

### APPENDIX

1.) Having reviewed the transcript, the Court finds Juror No. A–31 indifferent and DENIES the defendants' challenge for cause respecting that juror. The totality of the juror's responses and the Court's perceptions of his inflections leads to the conclusion that his concern over the term "revolutionary" was not an expression of animus toward any of the defendants.

2.) Upon reconsideration and review of the transcript, the Court adheres to its ruling that Juror No. A–236 is indifferent. Accordingly, the defendants' renewed challenge of that juror for cause is DENIED.

3.) The government shall have one hour and forty-five minutes for its opening on Tuesday, January 10, 1989. The defendants together shall have a like time on that day and an additional hour for opening at the outset of the trial day, January 11, 1989, for an aggregate of two hours and forty-five minutes. The defendants shall inform the Court on Monday, January 9, 1989 as to how they wish to allocate their time and in what order. In the event of disagreement, the defendants shall be given equal time in the order they are listed in the indictment. In setting these limits, the

---

**26.** That is, some paragraph other than paragraphs seven and sixteen.

Court neither invites nor requires that the parties use all the time allocated.